**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **AMANDA BAILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-11-264-JHP** |
| | ) | |
| **JOEL KERNS, Sheriff of Pittsburg County,** | ) | |
| **Oklahoma, in his official capacity,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment,[1] Plaintiff's Response and

Objection to Defendant's Combined Motion for Summary Judgment,[2] Defendant Joel Kerns, Sheriff

of Pittsburg County, in his Official Capacity's Reply to Plaintiff's Response to Defendant's Motion

for Summary Judgment,[3] and Plaintiff's Surreply to Defendant's Reply in Support of his Motion for

Summary Judgment.[4] For the reasons detailed below, Defendant's Motion for Summary Judgment

is **GRANTED**.

## BACKGROUND

**A. Undisputed Factual Background**

The instant case arises from an arrest and approximately 35 hour incarceration of Plaintiff

---

[1]Docket No. 56.

[2]Docket No. 66.

[3]Docket No. 78.

[4]Docket No. 105.

and her daughter at the Pittsburg County Detention Center beginning Sunday, January 3, 2010.[5] In accordance with Local Civil Rule 56.1©, the following facts are either not specifically controverted by Plaintiff or described in the light most favorable to Plaintiff as the nonmoving party. Immaterial facts are omitted. The Court looks to the events of each day of Plaintiff's incarceration.

1. January 3, 2010

Some time on January 3, 2010, Plaintiff, her daughter Jamie Hallmark, and Hallmark's three children fled to Oklahoma from Texas in an effort to prevent Texas Child Protective Services from terminating Hallmark's parental rights to the children.[6] Upon arriving in McAlester, Oklahoma, Bailey decided to go to the hospital to get treatment for an injury to her right hand and arm.[7] At approximately 7:35 p.m. on January 3rd, Plaintiff checked into the McAlester hospital under the assumed name "Elizabeth Ellis," the name of Plaintiff's sister.[8] At the hospital, Plaintiff reported that the hand was swollen and that the injury was causing severe pain.[9]

At the hospital, Plaintiff's arm was wrapped in a hand splint and Plaintiff was prescribed two medications, an antibiotic and a pain reliever.[10] Those prescriptions were written for "Elizabeth Ellis," the alias under which Plaintiff had registered.[11] Plaintiff was released from the hospital at

---

[5]Motion at 9, Docket No. 56.

[6]*Id.*

[7]*Id.*

[8]*Id.* at 10. Deposition of Amanda Bailey at 8, Docket No. 56-1.

[9]*Id. See also* Response at 8, Docket No. 66 (Plaintiff informed emergency room her pain was "10 out of 10").

[10]Motion at 10, Docket No. 56.

[11]*Id.*

approximately 9:05 p.m., despite her reported pain of "8 or 9 out of 10" and the fact her hand and arm remained swollen.[12] Plaintiff did not immediately fill the prescriptions as it was nearly 10:00 p.m. on a Sunday, and hospital personnel had told her it was fine to wait.[13] It is unclear from the record whether Plaintiff would have been able to fill the prescriptions as they were prescribed to her under an assumed name. After leaving the hospital, Plaintiff drove to her father's McAlester home with her daughter and the children.[14] Late on the evening of January 3rd, Plaintiff and her daughter were arrested by law enforcement officials and transferred to the Pittsburg County Detention Center (PCDC) by Oklahoma Highway Patrol Troopers.[15]

2. January 4, 2010

Plaintiff arrived at the PCDC at around 12:00 a.m. on January 4th and was booked in by Detention Officer Leann Drake.[16] Plaintiff advised Drake that she had injured her arm and had been treated at the McAlester hospital earlier that evening.[17] On Plaintiff's intake Medical Questionnaire, Drake checked the box indicating Plaintiff had "visible signs of trauma, illness, obvious pain or bleeding, requiring emergency or doctor's care."[18] The explanation indicated was "broken left

---

[12]*Id.*

[13]*Id.* Response at 8, Docket No. 66.

[14]*Id.*

[15]*Id.* at 11.

[16]*Id.*

[17]*Id.*

[18]Medical Questionnaire at 2, Docket No. 66-3.

arm."[19] The Questionnaire goes on to ask Plaintiff direct questions about her health. In this portion, there is a box checked indicating "yes" to the question "Have you recently been hospitalized or treated by a doctor?" and for which there is no explanation. Boxes indicating "no" were also checked for the follow-up inquiries "How was the injury received" and "Prescriptions/Medical Treatments/Medical Programs."[20] No explanations were provided for these entries. Plaintiff signed the Questionnaire certifying she had answered truthfully the questions about her health.[21] Plaintiff's book-in was completed and Plaintiff was placed in a cell with her daughter in H-Pod at 1:50 a.m. on January 4, 2010. Plaintiff testifies that she requested pain medication, ice, and to go to the hospital throughout the remainder of the night.[22]

Between 9:00 and 9:30 a.m. on January 4th, Plaintiff approached PCDC nurse Doris Barlow during her morning rounds.[23] Barlow noted that Plaintiff's right arm was in what appeared to be a cast and was advised by Plaintiff that she had injured her arm.[24] Plaintiff also advised Barlow that medications had been prescribed to Plaintiff under the name "Elizabeth Ellis."[25] Barlow understood that Plaintiff had gone to the emergency room in Paris, Texas, and contacted that hospital at around

---

[19]*Id.*

[20]*Id.* at 4.

[21]*Id.* In her deposition Drake specifically denies that Plaintiff informed her of any required prescriptions. *See* Deposition of Leann Drake at 5, 13:4-18, Docket No. 66-4.

[22]Deposition of Amanda Baily at 28-29, 104:4-105:25, Docket No. 66-1.

[23]Motion at 12, Docket No. 56.

[24]*Id.*

[25]*Id.*

10:30 a.m seeking information about Plaintiff's treatment and prescriptions.[26] Barlow was advised by the Texas hospital that there was no record of any Bailey in previous days.[27] Soon after, Nurse Barlow realized that there had been some misunderstanding and that Plaintiff had been referencing her treatment in McAlester, but nothing in the record suggests Barlow contacted the McAlester hospital. Plaintiff was provided Tylenol for pain at approximately 1:00 p.m., and at 1:15 p.m. Barlow returned and visited with Plaintiff further.[28] Although Nurse Barlow knew that a doctor had prescribed medications, it was Barlow's opinion that Plaintiff's symptoms were not serious enough to warrant Plaintiff's immediate transport to a doctor to get prescriptions in the appropriate name.[29]

Later on the afternoon of January 4th, Plaintiff was transported to the Pittsburg County Courthouse where she appeared before a judge and waived extradition back to Texas.[30] Plaintiff made no comment to the judge or court staff about pain or lack of medical care.[31] Before Nurse Barlow left the facility, she gave verbal directions authorizing the staff to give Plaintiff Ibuprofen or Tylenol every 4-6 hours if Plaintiff requested or complained of pain.[32] At 5:30 p.m. on January 4th, Plaintiff was moved from general population to a suicide watch observation room.[33] It is

---

[26]*Id.*

[27]*Id.*

[28]*Id.*

[29]Deposition of Doris Barlow at 24, 35:5-25, Docket No. 66-5.

[30]Motion at 13, Docket No. 56.

[31]*Id.*

[32]*Id.*

[33]*Id.*

disputed as to why Plaintiff was moved. In the observation room, Plaintiff was given pain reliever at 10:15 p.m. on January 4th.[34]

### 3. January 5, 2010 to Present

Plaintiff was again administered pain reliever at 6:30 a.m. on January 5th.[35] Plaintiff testifies that she suffered from fever, chills, vomiting, and diarrhea throughout the night of January 4th and that she requested medication nearly every hour.[36] This testimony with respect to Plaintiff's symptoms is consistent with admission records at the McAlester hospital.[37] Around 9:00 a.m. on the morning of the January 5th, Nurse Barlow noted Plaintiff was in the observation room "distraught, crying, and complaining of pain."[38] Barlow quickly made her morning rounds and returned to examine Plaintiff.[39]

Barlow found Plaintiff to be in obvious pain, observed that Plaintiff's arm was more red and swollen than it was the previous day and noted that Plaintiff's capillary refill to her arm was slow, indicating lack of circulation.[40] Barlow did not know if the issues were due to swelling or were caused by the tightness of the wrap around Plaintiff's arm.[41] In her deposition, Nurse Barlow

---

[34]*Id.* at 14.

[35]*Id.* at 14.

[36]Deposition of Amanda Baily at 47-49, 128:5-129:24, Docket No. 66-1.

[37]*See* Discharge Summary at 2, Docket No. 66-9 ( "acute renal failure secondary to nausea and vomiting and sepsis").

[38]Motion at 13, Docket No. 56.

[39]*Id.*

[40]*Id.*

[41]*Id.*

acknowledged that unrelieved pain like that experienced by Plaintiff may constitute a medical emergency, but testified at the time she did not believe Plaintiff's injuries were life threatening or warranted calling an ambulance.[42]

After evaluating Plaintiff, Barlow approached Jail Administrator Missi Eldridge and advised her of her findings and recommended Plaintiff be sent to the hospital for further evaluation.[43] The two agreed that Plaintiff should be sent to the hospital, but agreed that the situation was not life-threatening and that Plaintiff could be transported when a transportation officer became available rather than by ambulance.[44] Between 10:00 and 10:30 a.m., Nurse Barlow again gave Plaintiff Ibuprofen and advised Plaintiff that she would be taken to the hospital as soon as possible.[45]

Plaintiff departed for the hospital at 11:51 a.m. and was admitted to the emergency room at 11:57 a.m.[46] Plaintiff presented at the hospital with acute renal failure secondary to nausea, vomiting, and sepsis (infection).[47] Plaintiff was treated with antibiotics and was ultimately diagnosed with "compartment syndrome" in her right arm.[48] During her approximately six-day stay in the McAlester hospital, Plaintiff underwent multiple surgical procedures to relieve pressure and treat

---

[42]Deposition of Doris Barlow at 26-28, 43:6-45:6, Docket No. 66-5.

[43]Motion at 15, Docket No. 56.

[44]*Id.*

[45]*Id.*

[46]*Id.*

[47]*See* Discharge Summary at 2, Docket No. 66-9.

[48]*Id.*

her arm.[49] On January 10, 2010, Plaintiff was released from the McAlester hospital and transferred, in good condition, to Texas Correctional Medical Facility employees.[50] Three months after Plaintiff's confinement at the PCDC, during her continuing treatment in the Texas facility, Plaintiff's right arm was amputated.[51]

## B. Relevant Procedural History

Plaintiff filed her original Petition in Pittsburg County District Court on February 25, 2011 against Pittsburg County Sheriff's Department, the Board of County Commissioners of Pittsburg County, Pittsburg County Sheriff Joel Kerns, both in his official and individual capacities, and a number of unknown employees of the Pittsburg County Sheriff's Department in their official and individual capacities.[52] After this Court's ruling on the Defendants' Motion to Dismiss, Plaintiff filed a Second Amended Complaint raising 42 U.S.C. §1983 claims against Sheriff Joel Kerns, Undersheriff Richard Bedford, Jail Administrator Missi Eldridge, Nurse Doris Barlow, Officer Leann Drake, and two John Doe officers, all in both their individual and official capacities.[53]

The instant Motion for Summary Judgment was filed on June 29, 2012.[54] With the permission of the Court, Plaintiff's Response was filed out of time July 20, 2012, responding to

---

[49]*Id.*

[50]*Id.*

[51]*See* Motion at 8, Docket No. 56.

[52]Docket No. 2-1.

[53]*See* Docket No.'s 22, 24.

[54]Docket No. 56.

Defendant's Motion for Summary Judgment as to each of Plaintiff's claims.[55] On August 1, 2012, Plaintiff filed a Stipulation of Dismissal, dismissing all parties but Pittsburg County Sheriff Joel Kerns in his official capacity as Sheriff of Pittsburg County.[56] On August 3, 2012, Defendant filed a Reply brief offering focused argument on Plaintiff's remaining official capacity claim.[57] At the August 17, 2012 pre-trial conference, the court offered Plaintiff the opportunity to file a surreply focusing her argument on the remaining official capacity claim.[58] Plaintiff filed her Surreply on August 23, 2012.[59] All remaining issues are fully briefed and before the Court.

## DISCUSSION

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56© provides the standard courts must use when determining whether summary judgment is proper. According to the rule, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[60] A material fact is one that is essential to disposition of a claim,

---

[55]*See* Docket No.'s 65, 66.

[56]Docket No. 74.

[57]Docket No. 78.

[58]*See* Docket No. 103.

[59]Docket No. 105.

[60]Fed. R. Civ. P. 56(c)(2). *See also Jennings v. Badget*, 2010 OK 7, ¶¶ 4-5, 230 P.3d 861, 864.

and a genuine issue is present when the trier of fact could resolve it in favor of either party.[61]

The movant bears the burden of demonstrating the absence of a genuine factual issue, but upon demonstrating that no issue exists the non-movant must go beyond the pleadings and set out specific admissible facts that show a genuine issue for trial.[62] If a party bearing the burden of proof at trial lacks sufficient evidence on any essential element of a claim, all other factual issues concerning the claim become immaterial.[63]

## B. Inadequate Medical Care

In pursuing a claim for inadequate medical care, a plaintiff must first demonstrate that the inadequate medical care alleged amounted to a constitutional deprivation. To do so, Plaintiff must show that (1) she presented a serious medical need *and* (2) that acts or omissions by prison officials indicate there was a deliberate indifference to that need.[64] Here, although it is evident from the testimony that Plaintiff's recent hospitalization and the prescriptions issued objectively indicated a serious medical need to PCDC staff, the Court questions whether the alleged acts and omissions of PCDC staff regarding Plaintiff's care amount to "deliberate indifference" to that serious medical need. However, even assuming, *arguendo*, that the care provided Plaintiff by PCDC employees during her 35 hour incarceration was so woefully inadequate as to evidence deliberate indifference to Plaintiff's serious medical need, Plaintiff still cannot succeed on an official capacity claim against

---

[61]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[62]*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

[63]*Id.* at 322.

[64]*See Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir.2006) ("[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs") (*citing Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Defendant Kerns.

Plaintiff's suit continues only as a §1983 action against Sheriff Joel Kerns in his official capacity as Sheriff of Pittsburg county and chief policymaker for the Pittsburg County Sheriff's Department.[65] Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."[66] The doctrine of *respondeat superior* is not a basis for imposing municipal liability, rather "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983."[67]

Succinctly stated, for Plaintiff to impose official capacity liability under §1983 in this instance, she must (1) identify an official policy or custom and (2) offer evidence of an affirmative or direct causal link between the municipal person's adoption or implementation of that policy and the alleged deprivation of her constitutional rights.[68] "Where, [as here], a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."[69]

Plaintiff contends that a combination of inadequate policies and a widespread custom of

---

[65]*See* Stipulation of Dismissal, Docket No. 74.

[66]*Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

[67]*Id.* at 694.

[68]*Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382,137 L.Ed.2d 626 (1997); *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010) (*citations/quotations omitted*).

[69]*Bryan County*, 520 U.S. at 405.

prioritizing budget concerns over inmate welfare worked together to cause Plaintiff's injury.[70] The Court addresses each of these arguments separately.

1. Inadequate Policies

Looking first to Plaintiff's contention that the policies in place were insufficient to prevent Plaintiff's injury, the Court notes that Plaintiff makes frequent reference to the fact that jail policies and procedures have not been updated since 2003. Plaintiff argues that this is an important issue because the jail moved to a larger facility in 2009.[71] However, Plaintiff makes little effort to specifically connect any failure to amend the policies with her injuries or demonstrate that Defendant Kerns had any knowledge that failure to update the 2003 policies would result in the violation of inmates' Constitutional rights. As such, this argument amounts to a conclusory allegation and does little to advance Plaintiff's position.

Plaintiff also alleges it was consistent with policy to delay and refuse treatment after the need for treatment was recognized by staff. In support, Plaintiff contends existing policy allowed for Officer Drake to note immediate medical care was necessary on Plaintiff's intake questionnaire, but did not require that Plaintiff be immediately taken for treatment.[72] Plaintiff's argument on this issue is largely a product of the form of the questionnaire. The questionnaire only asks closed-ended questions, creating a situation where Drake "checked the box" noting Plaintiff had visible signs of trauma, *i.e.*, a cast on her right arm, but in doing so also had to accept the question's determination

---

[70]*See* Surreply at 4-5, 7, Docket No. 105 (arguing policy dictates intake notation "needs immediate medical care" does not require the administering of immediate medical care; arguing customs aimed at cost-cutting interfere with prescribed medical treatment).

[71]Response at 22, Docket No. 66; Surreply at 5, Docket No. 105.

[72]Surreply at 6, Docket No. 105.

that the injury required immediate medical care.[73]

This is not competent evidence to establish Drake had determined Plaintiff needed emergency medical care, and it certainly does not create a material question of fact as to whether existing policy permitted staff to ignore legitimate medical emergencies. In fact, Drake specifically refuted Plaintiff's contention that she made a determination that Plaintiff needed immediate care. In her deposition, Drake essentially states that, had Plaintiff presented with an obvious need for immediate medical care, policy dictated that she have the arresting agency clear Plaintiff through medical personnel before booking.[74] Drake further stated that had she believed Plaintiff needed more care than was provided at the recent emergency room visit, she would not have merely "checked the box" and moved on.[75]

Plaintiff also emphasizes statements by Defendant Kerns that Plaintiff's treatment was consistent with policy. Plaintiff essentially argues that if employees actually followed policy, and Plaintiff was injured in spite of this adherence to policy, then the policy must be inadequate.[76] Despite Plaintiff's arguments, the unique facts of this case tend to show that lapses in judgment by skilled employees, and not the codified PCDC policies, were the likely cause of Plaintiff's injuries. This, at best, amounts to individual employee negligence rather than any policy failing.

All of the examples cited by Plaintiff fit this paradigm. With regard to the book-in by Officer

---

[73]*See* Medical Questionnaire at 2, Docket No. 66-3.

[74]Deposition of Leann Drake at 6-7, 14:11-15:20, Docket No. 66-4.

[75]*Id.* at 7, 15:3-10 ("Q: You just check it and continue on? A: If I was going to check this and you were being booked in and you were bleeding and you needed to see a physician immediately, I would have never gotten this far. . . .A: I would tell the arresting officer or agency to go have you cleared before I process you").

[76]*See* Surreply at 9, 12-13, Docket No. 105.

Drake, Plaintiff presented to the jail facility immediately after receiving emergency medical care. As Plaintiff had very recently been treated, Officer Drake noted Plaintiff had an injury, but did not send her for further treatment. Failing to send an inmate who had just come from the hospital back to the hospital for further treatment does not rise to the level of negligence, nor does it illuminate some failure of existing PCDC policies.

With respect to the treatment by Nurse Barlow, PCDC policies provided for Plaintiff to be examined by Nurse Barlow the next morning, within eight hours of book-in. Some time after the initial examination, Barlow discovered that the medications prescribed to treat Plaintiff's arm were in the name of her sister. It is against PCDC policy, and against state and federal law, to administer prescription medications either without a prescription or to parties for whom the prescription was not written. Although Nurse Barlow could have ordered Plaintiff to see another doctor immediately to get new prescriptions, it was Barlow's medical opinion that new prescriptions could wait until the physician's assistant arrived on Wednesday, January 5th.[77]

Although with the benefit of hindsight it appears that Plaintiff should have immediately received the antibiotics prescribed, this is not a failure of the policy. In fact, jail policy provided for the examination by Nurse Barlow and Plaintiff was examined at least three times by Nurse Barlow in the course of her 35 hour incarceration. During two examinations on January 4th, Nurse Barlow, a trained medical professional, did not feel that Plaintiff's previously treated injury required immediate medical attention. Plaintiff's claim here, at best, is one of professional negligence on the part of Nurse Barlow for failing to recognize the severity of Plaintiff's injury. Professional

---

[77]*See* Deposition of Doris Barlow at 11, 16:2-19, Docket No. 56-2.

negligence does not rise to the level of a constitutional injury.[78] This is not evidence of an inadequate policy or custom.

Plaintiff also contends that because PCDC policy permitted employees to wait for a transport officer in emergency situations, PCDC policy caused to the two-hour delay in Plaintiff's January 5th transport to the hospital, thus contributing to Plaintiff's injuries. Again, Plaintiff points to individual negligence as being an indicator of inadequate policy. At best, the decision to wait for a transport officer was a judgment call by employees which may constitute individual negligence, but does not indicate a policy failing.

An issue that does cause the Court some concern is PCDC policies with regard to the observation room in which Plaintiff was placed at or around 5:30 p.m. on January 4th. Plaintiff was isolated in the observation room, ostensibly to be observed, in order to prevent a possible suicide attempt.[79] Plaintiff's hospital records indicate that upon her January 5th admission, Plaintiff was suffering from acute renal failure due at least in part from continued vomiting and diarrhea.[80] The Court specifically questions how an individual with vomiting and diarrhea sufficient to cause acute renal failure can escape notice from 5:30 p.m. on January 4th until 9:00 a.m. on January 5th, despite

---

[78]*Mata*, 427 F.3d at 751 ("Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim").

[79]*See* Motion at 13-14, Docket No. 56 (Plaintiff was placed in the observation room "as the result of a phone call from Texas law enforcement advising the Jail that during a search of the vehicle left in Texas, police located a suicide note in Plaintiff's property and asked the Jail to keep a close eye on Plaintiff").

[80]*See* Discharge Summary at 2, Docket No. 66-9 ( showing diagnosis of "acute renal failure secondary to nausea and vomiting and sepsis");

being placed in a room designed to provide constant observation.[81]

With more evidence, this lapse might offer some circumstantial support for Plaintiff's contention that existing policies permitted officers to delay and refuse Plaintiff treatment even after the need for treatment was recognized. However, Plaintiff fails to offer evidence indicating that any failure to act in this instance was anything other than a one-time violation of existing observation procedure by on-duty employees. Proof of a single incident of unconstitutional activity is not sufficient to impose municipal liability, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy.[82]

The Court has carefully reviewed all of Plaintiff's allegations regarding the inadequacy of existing policies. Through her arguments, Plaintiff has merely presented an isolated instance where either professional judgment failed or existing policies were not followed. This evidence is insufficient to merit the imposition of municipal liability.[83] Consequently, Plaintiff fails to raise a material question of fact as to whether existing PCDC policies were the moving force behind her alleged Constitutional deprivation.

2. Existence of Cost-Cutting Custom

Plaintiff also asserts there was an unwritten custom or practice of prioritizing budget concerns that prompted employees to intentionally interfere with inmate medical treatment as a

---

[81]*See* Response at 20, n. 12, Docket No. 66 (Plaintiff's treating physician testified that it usually takes one whole day of vomiting, diarrhea, and fever to reach acute renal failure).

[82]*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

[83]*Id.*

means of cutting the PCDC's inmate healthcare costs.[84] An informal custom, although neither written or otherwise formally expressed, may support municipal liability if it amounts to a widespread practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law."[85] However, Plaintiff's proffered evidence of such a custom ultimately does not support a reasonable inference that any such custom caused Plaintiff's injury.

Looking to that evidence, Plaintiff first offers evidence that PCDC bills inmates post-release for its treatment of "pre-existing injuries," that is PCDC sends discharged inmates the bills for treatment of any injuries suffered before the inmate's incarceration.[86] Plaintiff also offers evidence that if an inmate is eligible for treatment at Indian healthcare facilities those will be used rather than emergency facilities.[87] However, Plaintiff does not allege these "customs" are unconstitutional and does not explain how either of these alleged practices may have contributed to Plaintiff's injuries. Plaintiff merely contends they are part of a greater cost- cutting scheme that ultimately results in constitutional deprivations. However, these particular practices are largely inapplicable to the Plaintiff's situation, and do not support any reasonable inference that cost-cutting was the moving force behind Plaintiff's alleged deprivation.

Plaintiff also offers Nurse Barlow's statement that she normally waits to proceed with inmate medical care until the inmate can see a judge as evidence of a custom or practice that caused the

---

[84]Surreply at 8-9, Docket No. 105.

[85]*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)) (*internal quotations omitted*).

[86]*Id.* at 6.

[87]*Id.* at 6-7.

instant injury.[88] Barlow explains that such a wait is generally reasonable, as people are often discharged at arraignment.[89] Plaintiff seemingly implies that Barlow would impose such a wait if an inmate presented with signs he or she required immediate medical care in an effort to save expense, and that this practice caused Plaintiff's injuries. However, the evidence provided does not support this conclusion.

Rather, the testimony in this case indicates that whether or not any delay in treatment occurs is at the discretion of a trained medical care provider, Nurse Barlow.[90] The record is clear that, at the time of her January 4th examinations of Plaintiff, Nurse Barlow did not feel Plaintiff's arm required immediate medical attention.[91] Consequently, if Plaintiff's injury was caused by any delay in further care, it was not a result of any constitutionally infirm custom or practice, but from professional negligence on the part of Nurse Barlow. Although the Court could envision a custom or practice under which a delay of further care could meet §1983's causation requirement, such a custom is not at work here. The decision to delay Plaintiff's medical care was not the result of Nurse Barlow's dogged execution of a PCDC custom or practice of delaying treatment until after arraignment. Rather, as the testimony of Sheriff Kerns and Nurse Barlow bear out, the decision to delay further care was ultimately made based on Barlow's professional assessment of Plaintiff's medical needs.

---

[88] *Id.* at 7.

[89] *See* Deposition of Doris Barlow at 6, 11:2-7, Docket No. 66-5.

[90] *See* Deposition of Joel Kerns at 16, 24:5-13, Docket No. 66-12 ("A: She is the medical professional. If she seen necessary, I think she would have took whatever action she needed to take at the time").

[91] *See* Deposition of Doris Barlow at 7, 13:1-7, Docket No. 66-5 (after performing basic medical examination concluding "[T]here seemed to be nothing wrong with her").

The cost-saving practices cited by Plaintiff are at work in many jail facilities and are often necessary to ensure the continued operation of such facilities. However, to make her case that such a practice caused her injury, Plaintiff must offer evidence creating a material question of fact as to whether the custom or practice of cost-cutting took precedence over explicit policies governing inmate medical care. Plaintiff does not do so. Rather, Plaintiff attempts to characterize what may ultimately amount to employee negligence as actions in conformity with a practice of cutting costs, despite testimonial evidence of employees directly to the contrary.[92] As previously stated, "[r]igorous standards of culpability and causation must be applied to ensure that [a] municipality is not held liable solely for the actions of its employee."[93] Here, Plaintiff's argument focuses on acts of apparent employee negligence but fails to offer competent evidence showing that those acts or omissions were committed in an effort to conform with the cost-saving practices cited. Consequently, Plaintiff fails to raise a question of material fact as to whether such cost-saving practices were the moving force behind Plaintiff's injury.

## C. Inadequate Training/Supervision

Plaintiff further alleges that her injuries were caused by Kerns' failure to train and supervise employees in accordance with relevant policies. Although municipal liability may be premised on a failure to train, to prevail on such a claim a plaintiff must offer evidence that demonstrates "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have

---

[92]*Id.*; Deposition of Leann Drake at 6-7, 14:11-15:20, Docket No. 66-4.

[93]*Bryan County*, 520 U.S. at 405.

been deliberately indifferent to the need."[94]

Because the viability of a plaintiff's claim is contingent upon the municipal actor being "deliberately indifferent," only where a plaintiff can establish that the facts available to policymakers put them on actual or constructive notice that the training in place, or lack thereof, is likely to result in the violation of the constitutional rights of their citizens, can it be said that the municipality has made "a deliberate choice to follow a course of action" sufficient to impose municipal liability.[95] In her special opinion in *City of Canton, Ohio v. Harris*, Justice O'Connor contemplated two scenarios in which a failure to train could generally support a finding of "deliberate indifference" sufficient to sustain municipal liability: (1) where there is evidence that a municipality failed to train its employees "concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face," or (2) "where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations."[96] While the first solely implicates a duty to train regarding Constitutional responsibilities, the second implicates the municipal duty to both provide training and supervise the performance, or carrying out, of that training.

---

[94]*City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-90, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) ("In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury").

[95]*See id.* at 396 (*O'Connor, J. Concurring in part, dissenting in part*); *see also* Barney v. Pulsipher, 143 F.3d 1299, 1307 (10thCir.1998) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm").

[96]*Id.* at 396-97 (*O'Connor, J. concurring in part, dissenting in part*) ("In my view, it could be shown that the need for training was obvious in one of two ways. . .").

Plaintiff fails to offer facts evidencing that Defendant is culpable for either a failure to train or a failure to supervise. It is clear that the Detention Center had training in place to provide for inmate medical care in order to prevent the constitutional harm complained of by the Plaintiff. Jail staff are formally trained regarding Oklahoma State Jail Standards, and to a lesser extent, Jail Policies and Procedures.[97] Employees are also authorized by jail Policy to immediately transport inmates who report shortness of breath or serious pain.[98] Although Plaintiff argues that there is no training in place to assist jail staff in identifying serious injuries that require emergency transport, Plaintiff also does not refute that (1) jail employees are trained in first aid and CPR, (2) in emergency situations, guards may transport inmates to the emergency room, and (3) jail staff are able to contact the jail administrator who generally authorizes transport based on the trained judgment of her officers on the scene.[99] From this evidence, it is clear that jail employees were trained regarding their constitutional duty to provide emergency medical care.

Further, Plaintiff cannot show a pattern of conduct that would have put Defendant on notice that employee training or his supervision of the employees regarding that training was inadequate. Although Plaintiff need not offer evidence of a pervasive problem to raise a fact question as to deliberate indifference, Plaintiff fails to offer evidence of even one other incident that could have given policymakers notice that employee training in the relevant policies and procedures was

---

[97]Deposition of Missi Eldridge at 6, 11:21-24, Docket No. 66-14 (discussing "jail schools"); Deposition of Joel Kerns at 7-8, 14:20-17:5 (employees participate in "jail schools" over Oklahoma State Jail Standards, and receive on-the-job training regarding jail policies).

[98]Deposition of Missi Eldridge at 20-21, 69:14-70:25, Docket No. 66-14.

[99]*Id.* at 6, 11:21-24, Docket No. 66-14; Deposition of Joel Kerns at 7-8, 14:20-17:5 (employees participate in first aid, CPR, jail schools over Oklahoma State Jail Standards, and receive on-the-job training regarding jail policies).

insufficient or that those policies were not being implemented.[100] Without some evidence that Defendant knew the training in place was somehow insufficient or that the policies were not being implemented, Plaintiff cannot show that Defendant acted with deliberate indifference with respect to the training or supervision of his employees. As Plaintiff can show neither that Defendant failed to train employees concerning the clear constitutional duty to provide medical care nor that Defendant was in any way on notice that the existing training was inadequate, Plaintiff fails to raise a question of material fact with regard to her allegations of inadequate training.

### D. Inadequate Staffing

Plaintiff also makes passing claims that PCDC was inadequately staffed and this policy somehow contributed to the deprivation complained of by Plaintiff.[101] This allegation is primarily based on the over two hour wait between 9:30 a.m. on January 5th when Nurse Barlow determined Plaintiff need to go to the hospital and 11:51 a.m. when the transport officer arrived.[102] Plaintiff alleges that a lack of transport officers caused the delay in transporting Plaintiff to the hospital and contributed to Plaintiff's ultimate injury.[103]

Again Plaintiff points to an employee judgment call in an attempt to evidence an infirm policy.  Upon finding the noticeably ill Plaintiff, Nurse Barlow and Jail Administrator Eldridge

---

[100]*Brown v. Gray*, 227 F.3d 1278, 1289 (10th Cir.2000) ("None of the Supreme Court or Tenth Circuit failure to train cases require the plaintiff to prove the existence of a pervasive problem. Nor must the plaintiff present explicit evidence that the chief of police was personally aware of and chose to ignore the problem").

[101]The Court emphasizes the shallow nature of this argument as it is primarily relegated to footnotes in Plaintiff's Surreply. *See* Surreply at 5, n.2, 9, n.3, 11, n.4, Docket No. 105.

[102]*Id.* at 9, n.3, 11, n.4.

[103]*Id.* at 11, n.4.

determined that Plaintiff's condition, although serious, was not life threatening and did not require an ambulance. Nurse Barlow specifically testified to this fact at her deposition.[104] As the Court has previously stated, any injury caused by this wait was the result of an employee judgment call to wait rather than call an ambulance. It cannot be fairly attributed to any policy related to the staffing of the PCDC. Consequently, Plaintiff fails to raise a material question of fact as to whether any policy of understaffing may have caused Plaintiff's injury.

## CONCLUSION

Plaintiff fails to offer competent evidence supporting a reasonable inference that any policy or custom of Sheriff Kerns or the Pittsburg County Sheriff's Department was the moving force behind Plaintiff's alleged constitutional deprivation. Consequently, Defendant Joel Kerns is entitled to summary judgment on Plaintiff's claims. Defendant's Motion for Summary Judgment is **GRANTED**.[105] A separate Judgment is filed herewith.

**IT IS SO ORDERED** this 28th day of September, 2012.

James H. Payne
United States District Judge
Eastern District of Oklahoma

---

[104]*See* Deposition of Doris Barlow at 27, 43:2-13, Docket No. 56-2.

[105]Docket No. 56.